IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-00731-FL

| | |
|---|---|
| **Neil C. Graham,** | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **Nancy A. Berryhill**, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

Plaintiff Neil C. Graham instituted this action on August 9, 2016, to challenge the denial of his application for social security income. Graham claims that the Administrative Law Judge ("ALJ") Mason Hogan erred in (1) determining that he had the residual functional capacity ("RFC") to perform a reduced range of light work and (2) evaluating the medical opinion evidence. Both Graham and Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 16, 20.

After reviewing the parties' arguments, the court has determined that ALJ Hogan reached the appropriate decision. The undersigned finds that substantial evidence supports ALJ Hogan's conclusion that Graham has the RFC to perform a reduced range of light work. Additionally, Graham has failed to establish error in ALJ Hogan's evaluation of the medical opinion evidence.

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

Therefore, the undersigned magistrate judge recommends that the court deny Graham's motion, grant Berryhill's motion, and affirm the Commissioner's decision.[2]

## I.      Background

On December 8, 2014, Graham filed applications for disability insurance benefits and supplemental security income. In both applications, Graham alleged a disability that began on May 11, 2011. After his claims were denied at the initial level and upon reconsideration, Graham appeared before ALJ Hogan for a hearing to determine whether he was entitled to benefits. ALJ Hogan determined Graham was not entitled to benefits because he was not disabled.  Tr. at 11–29.

ALJ Hogan found that Graham had the following severe impairments: degenerative joint disease of the right shoulder, a history of surgical repair for a rotator cuff tear and a biceps tear in the right shoulder, degenerative joint disease in both knees, degenerative disc disease and scoliosis in the lumbrosacral spine, and mild obesity. *Id*. at 13. ALJ Hogan found that Graham's impairments, either alone or in combination, did not meet or equal a Listing impairment. *Id.* at 15. ALJ Hogan then determined that Graham had the RFC to perform light work, with additional postural and manipulative limitations. *Id*. at 16. Graham can sit for six hours in an eight-hour workday and he can stand or walk for a total of six hours in an eight-hour workday. *Id*. He must have the flexibility to use a handheld assistive device, such as a cane, while standing and walking. *Id*. Graham cannot climb ladders, scaffolds, or ropes but he can occasionally climb ramps and stairs. *Id.* He can occasionally balance, stoop, kneel, and crouch but he cannot crawl. *Id*. Finally, Graham can occasionally reach overhead with his non-dominant upper extremity. *Id.*

---

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation.  28 U.S.C. § 636(b).

ALJ Hogan concluded that Graham is unable to performing his past relevant work as a flatbed truck driver, tractor trailer truck driver, or dump truck driver. *Id.* at 27. ALJ Hogan found that, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Graham was capable of performing. *Id.* at 28–29. These include: furniture rental consultant, cashier II, and sales attendant. *Id.* at 28. Thus, ALJ Hogan found that Graham was not disabled. *Id.* at 29.

After unsuccessfully seeking review by the Appeals Council, Graham commenced this action on August 9, 2016. D.E. 5.

## II.     Analysis

### A.     Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.     Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the

claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.    Medical Background

Graham sought treatment at Rural Health Group in 2011 for shoulder pain, tendonitis, and left knee pain. Tr. 549–54. He presented to the Emergency Department in October of that year for right shoulder strain. *Id*. at Tr. 721–22.

From October through December, Orthopaedic Specialists of North Carolina treated Graham. *Id*. at 574–97. On October 25, 2011, Graham underwent a right shoulder arthroscopic rotator cuff repair, arthroscopic distal clavicle excision, and biceps tenotomy. *Id*. at 559–66. Treatment for his right shoulder pain and rotator cuff repair, for which he underwent physical therapy and received injections, continued. *Id*. at 574–97. An MRI of the right shoulder revealed severe hypertrophy causing impingement. *Id*. Providers noted that he continued to experience significant pain after surgery and that he was not progressing as anticipated. *Id*.

From November 2011 through January 2012, Maria Pelham Medical Center treated Graham's right shoulder pain with physical therapy. *Id*. at 715–20. A subsequent EMG revealed ulnar neuropathy. *Id*. at 568–73. Graham continued to receive treatment for right shoulder and arm pain, cervicalgia, ulnar neuropathy, and dysesthesia at Orthopaedic Specialists of North Carolina in 2012. *Id.*

In November 2012, Graham received treatment in the Emergency Department of Piedmont Medical Center for severe back pain, degenerative disc disease, and lumbar strain. *Id*. at 627–33. X-rays of his lumbar spine showed degenerative disc disease. *Id*. He returned to the Emergency Department in January for severe back pain and right shoulder tendonitis. *Id*. at 634–40.

From March 15, 2013, through April 5, 2013, Carolina Orthopaedic Surgery Associates treated Graham for right shoulder pain, left knee pain, degenerative disc disease, lumbar spondylosis, osteoarthritis, back pain, and rotator cuff syndrome. *Id*. at 613–18. X-rays of his lumbar spine again showed degenerative disc disease. *Id*.

Graham attended physical therapy at Piedmont Medical for back pain. *Id*. at 683–86. In November 2013, Graham returned to the Emergency Department for severe back pain radiating down his bilateral legs. *Id*. at 687–93. X-rays of the lumbar spine revealed scoliosis and degenerative disc disease. *Id*.

Dr. Joel Rapchik performed a consultative examination on January 11, 2015. *Id*. at 697–99. Examination noted positive straight leg raise and an antalgic gait, and x-rays of the knee revealed bilateral degenerative changes. *Id*.

In April 2015, Graham sought treatment in the Emergency Department at Maria Parham Medical Center for severe right knee pain. *Id.* X-rays taken at that time showed tricompartmental

osteoarthritis. *Id*. at 706–07.  Graham returned to the Emergency Department later that month for severe back pain. *Id*. at 704–05. Imaging studies taken later that month revealed mild dextroscoliosis degenerative disc disease, and multilevel lumbar spondylosis in his lumbar spine, and degenerative changes in his left knee. *Id*. at 794–95.

Beckford Warren Medical Center treated Graham for lumbosacral radiculitis, chronic pain, degenerative disc disease, and right knee sprain from April 2015 through December 2015. *Id*. at 753–79. Treatment records noted a decreased range of motion in his back and that his pain was not alleviated by medication. *Id*.

In May 2015, Graham received treatment at Maria Pelham Orthopedics for his bilateral knee tricompartmental osteoarthritis and probable meniscus tear of the right knee. *Id*. at 726–28. Between June and December, Graham also sought treatment at Triangle Orthopaedic Associates for back pain, lumbar radiculitis, degenerative disc disease, and spinal stenosis. *Id*. at 729–34, 802–13. Records reflect that he had positive straight leg raise tests and reported that medications did not relieve his pain. *Id*. An MRI of the lumbar spine revealed degenerative disc disease, facet joint disease, and central stenosis. *Id*.

Maria Parham Medical Orthopaedics treated Graham for sciatica in August 2015. *Id*. at 736. Later that month, Henderson Orthopaedics instructed Graham not to work from August 19, 2015 through October 28, 2015. *Id*. at 737–39.

On October 28, 2015, Dr. Ralph Liebelt limited Graham to sedentary duty work until his next appointment. *Id*. at 740. Dr. Liebelt prescribed a cane for Graham in December 2015. *Id*. at 799. Between February 2016 and April 2016, Graham continued to receive treatment at Triangle Orthopaedic Associates for knee pain, shoulder pain, spinal stenosis, degenerative disc disease, and lumbosacral radiculitis. *Id*. at 828–38.

6

On December 9, 2015, Dr. James E. Kenney of Beckford Avenue Medical Center wrote a letter stating that Graham's medical conditions made him incapable of caring for his children. *Id.* at 824.

### D.     Residual Functional Capacity

Graham contends that ALJ Hogan erred in finding that he had the RFC to perform a reduced range of light work and that he misapplied the Medical-Vocational Guidelines. The Commissioner maintains, and the undersigned agrees, that substantial evidence supports ALJ Hogan's RFC determination.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96-8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

As noted above, ALJ Hogan determined that Graham was capable of performing light work with additional limitations. Tr. at 16. Graham contends that his credible testimony establishes that he is unable to work because of severe, chronic pain. He points out that he attempted to return to work but was unable to be on his feet for prolonged periods of time.

Despite medications, injections, and physical therapy, Graham stated that he has constant pain from his back that radiates down into his legs, making it difficult to walk. Graham testified that he has fallen because his knees give out. He also stated that he cannot reach overhead, lift or carry more than five pounds, sit or stand more than ten minutes, or drive. Given these allegations, Graham contends that ALJ Hogan erred in concluding that he could perform a reduced range of light work.

As the Commissioner points out, however, Graham relies on his own statements of limitations, which are largely uncorroborated in the record. ALJ Mason cited the reasons he did not fully credit Graham's own statements on impairment. There is substantial evidence supporting ALJ Mason's RFC finding.

First, Graham's treatment history does not support the extent of limitations he claims. After undergoing shoulder surgery in 2011 and receiving follow-up care through April 2012, Graham did not seek any additional treatment for approximately one year. *Id*. at 22. Graham next sought treatment in March 2013 when he complained of low back and knee pain. *Id.* Even though Graham maintains that his conditioned worsened at the end of 2013, he did not seek treatment for his condition, as the record reflects another gap in his care from November 2013 until January 2015. *Id*. Moreover, ALJ Mason also remarked that Graham was well-aware of the availability of treatment as he has sought emergency care for minor items like a bug bite. *Id.*

ALJ Mason also observed that strenuous activity often precipitated Graham seeking medical care. *Id*. Six treatment records between October 2011 and March 2013 note that Graham reported an increase in pain after moving furniture. *Id*. This suggests his intense pain occurred episodically following vigorous activity.

The conservative and routine nature of Graham's treatment was another reason ALJ Mason discredited statements about the intensity, persistence, and limiting effects of Graham's reported symptoms. The types of medications, treatments, and other methods used to alleviate symptoms are "important indicators of the intensity and persistence" of symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Aside from a surgery in 1984, Graham has not required surgical intervention for his back or knee pain. Tr. at 22. Nor has he required steroid medications, epidural injections, or physical therapy on an ongoing basis. *Id.*

The objective medical evidence supports ALJ Mason's RFC determination. With respect to his right shoulder pain, the record indicates that in April 2013, Graham had normal range of motion and x-rays showed no acute abnormalities; in January 2015, providers noted full range of motion, full strength, and Graham was able to perform manipulations with both upper extremities; and in December 2015, although imaging showed osteophytes and irregularity with the greater tuberosity, he had some pain but good strength and no persistent limitation of shoulder joint motion or signs of shoulder joint inflammation. *Id.* These records suggest Graham's should impairments do not result in functional limitations greater than the RFC.

The objective medical evidence also establishes that Graham's knee impairment does not cause limitations greater than those assessed in the RFC. Treatment records note: in 2011, his knee had tenderness but no inflammation; in 2013, he had crepitus but could flex his knee to 135 degrees; and in 2015, Graham displayed no signs of joint inflammation and, despite pain, he had a full range of motion, no difficulty getting on or of the examination table, sitting, or performing heel/toe and tandem walks, and he had an antalgic gait but did not use an assistive device. *Id.* at 19. Imaging studies noted minimal degenerative changes and minimal compartment narrowing. *Id.* These findings suggest Graham has some limitations but not to the degree he alleges.

As to his lower back symptoms, the record demonstrates that this impairment is also not as limiting as Graham contends. Imaging records from 2012 showed scoliosis but no other abnormalities, and providers diagnosed Graham with degenerative disc disease, lumbar strain, and lower back pain. *Id*. at 20. A March 2013 examination showed no muscle spams in his back, full range of motion of his spine, and negative straight leg raises, with x-rays indicating mild to moderate degenerative disc disease. *Id*. Graham's provider diagnosed him with lumbar spondylosis and referred him for physical therapy. *Id*. Subsequent visits in November 2013 and January 2015 reflect that Graham displayed a full range of motion in his spine. *Id.* Follow-up visits in July 2015, November 2015, and February 2016 demonstrate tenderness to palpitation of his back muscles but normal neurological findings. *Id*. at 21. These findings are inconsistent with the debilitating back pain.

Finally, the Commissioner points out that Graham stated he was a college student taking online courses during the relevant time period. He also stated that he played cards. These activities would appear to contradict his allegations that he could sit for only ten minutes.

In sum, the longitudinal record undermines Graham's assertions that he is more restricted in his functioning than the RFC determined. Graham has failed to show that additional restrictions were well-supported but omitted from the RFC. While the medical record reflects some limitation, ALJ Hogan credited those restrictions which were corroborated by the evidence. Although Graham's statements alleged greater limitations, as noted above, ALJ Hogan concluded that he was not fully credible. As that finding is supported by substantial evidence and due deference from the court, the present argument must be rejected.

### E. Medical Opinion Evidence

Graham also argues that ALJ Hogan erred in weighing the medical opinion evidence from Dr. Smith and Physicians Assistant Rosemarie Polinsky. The Commissioner posits that the opinion evidence was properly considered. The court finds that Graham has not established error by ALJ Hogan in his evaluation of the medical opinion evidence.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(c). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given. *See id*. § 404.1527(c)(3). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See id*. § 404.1527(c)(4).

According to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by

medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(d)(1).

Graham contends that the opinions of Dr. Smith and Polinsky deserve more weight because they were treating providers. She asserts that these providers both offered Medical Source Statements finding, among other things, that Graham could not bend at the waist, could not lift more than 25 pounds, could only stand or walk occasionally, could drive up to 30–40 minutes, and must avoid exposure to cold and damp places. Although Polinsky, a Physicians Assistant, is not considered an acceptable medical source, she may still offer an assessment on the severity of Graham's impairments.[3] Graham submits that these opinions are consistent with one another and with the record.

ALJ Hogan specifically discussed the opinions of Dr. Smith and Polinsky. Tr. at 25. He noted the limitations they assessed. *Id*. He remarked that these providers assessed an "extreme set of limitations" that were made "without any reference to objective findings or clinical signs and without any explanation" in their Medical Source Statements. *Id*. ALJ Hogan thus concluded

---

[3] While it does not impact this claim, for applications filed after March 27, 2017, physicians assistants are now considered acceptable medical sources for impairments within their licensed source of practice. *See* POMS DI 22505.003 Evidence from an Acceptable Medical Source (AMS).

that these opinions deserved little weight because they lacked supportability and consistency. *Id*.

Thus, despite their treating relationship with Graham, other factors supported a conclusion that

these opinions deserved less weight.

Substantial evidence supports ALJ Hogan's evaluation of the medical opinion evidence.

As noted above, treatment records do not support findings of significant medical impairment.

The limitations offered by Dr. Smith and Polinsky lack support in the medical record, which did

not indicate that Graham had difficulty bending at the waist or that he had any issues with

exposure to damp or cold places. Graham's knee impairment caused him limitations in kneeling

and crouching, yet Dr. Smith and Polinsky did not assess a restriction on these movements.

Moreover, while they opined that Graham was limited in his ability to stand or walk, these

findings were disproportionate to the objective findings and clinical signs evidenced by

examinations.

As noted above, Graham's complaints of pain often followed strenuous activity, he had

gaps in his treatment, and the objective evidence indicated mild to moderate findings. *Id*. at 22.

His treatment has been characterized as routine and conservative. *Id*. at 23. Providers remarked

that Graham was doing well with his pain medications and that he was capable of some level of

work. *Id*. at 22.

Given this evidence, ALJ Hogan did not err in concluding the limitations assessed by Dr.

Smith and Polinsky lacked support and consistency with both their treatment notes and the

overall record. Consequently, ALJ Hogan assigned less weight to their opinions and explained

his reasoning. Given these facts, ALJ Hogan's consideration of this medical evidence was

proper.

## III.    Conclusion

For the forgoing reasons, the court recommends that the court deny Graham's Motion for Judgment on the Pleadings (D.E. 16), grant Berryhill's Motion for Judgment on the Pleadings (D.E. 20), and affirm the Commissioner's determination.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel.  Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation, receive further evidence, or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** ***See Owen v. Collins*, 766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: August 11, 2017

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE